IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RUDY ROSENBERG, Individually And On Behalf Of All Others Similarly Situated, | |
| Plaintiff, | Case No. |
| vs. | |
| MICHAEL LEONARD BOGUSKI, ROBERT MORRIS McALAINE, PAUL ROBERT BURKE, RONALD LEE KING, SCOTT CARTER PENWELL, WILLIAM LLOYD SNYDER III, CHARLES HALL VETTERLEIN, III, EASTERN INSURANCE HOLDINGS, INC., | **COMPLAINT – CLASS ACTION** **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## COMPLAINT FOR VIOLATION OF §§ 14(a) AND 20(a) OF THE SECURITIES ACT OF 1934

Plaintiff Rudy Rosenberg ("Plaintiff"), by his attorneys, alleges upon information and belief, except for those allegations that pertain to Plaintiff, which are alleged upon personal knowledge, as follows:

## NATURE OF THE ACTION

1.    This is an individual stockholder action on behalf of the holders of the common stock of Eastern Insurance Holdings, Inc. ("Eastern" or the "Company") against the Company and the members of the Company's board of directors (the "Board" or the "Individual Defendants") arising out of their violations of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with the dissemination of a false and materially misleading preliminary proxy statement (the "Proxy") in connection with the proposed merger of Eastern and ProAssurance Corporation ("ProAssurace") (the

"Proposed Transaction") pursuant to the terms of an Agreement and Plan of Merger ("Merger Agreement"), dated September 23, 2013.

2.      On September 23, 2013, ProAssurance and Eastern entered into the Merger Agreement, whereunder each Eastern shareholder will receive $24.50 for every share of Eastern common stock owned (the "Merger Consideration") (the "Proposed Transaction").  Pursuant to the terms of the Merger Agreement, ProAssurance's wholly owned subsidiary, PA Merger Company, will be merged with and into Eastern.  The total enterprise value of the transaction is approximately $208 million. The Proposed Transaction does not provide adequate value for the Company and its future prospects.  The offer price of $24.50 per share represents only a 15.7% premium over the Company closing price of $21.16 on September 23, 2013, one day before the announcement of the Proposed Transaction.  As described in more detail herein, given Eastern's recent strong performance as well as its promising future growth prospects, the Merger Consideration is inadequate and significantly undervalues the Company.

3.      Management and the directors have entrenched themselves in their lucrative positions with the Company post-Proposed Transaction, while agreeing to a deal that leaves the Company's public shareholders with only a fraction of the actual and true value of their investments in Eastern.

4.      According to the Company's October 11, 2013 Proxy filed with the SEC, the members of the Board own approximately 15% of Eastern's outstanding shares, and collectively with Eastern's executive management own approximately 22.1% of the Company's outstanding common stock.  The Individual Defendants, in addition to benefiting from retention agreements and keeping their lucrative positions at the newly-formed company, will receive handsome

payouts in the form of golden parachute payments, retention payments provided that they remain with the newly-formed company, and stock sales.

5.      The Company's senior executives will also receive immediate and generous change-of-control payments.  For instance, Defendant Michael Leonard Boguski ("Boguski"), Chief Executive Officer ("CEO") of the Company, will receive $5,600,179 as a result of the accelerated vesting of his Eastern restricted stock options and/or deferred option exchange payments, along with other consideration as a result of the Proposed Transaction.  Other Eastern senior executives will receive substantial change-of-control payments as well.

6.      The Board has abdicated its responsibilities to Eastern's public shareholders by not performing a detailed, full, and transparent process and by omitting material information from the solicitation documents that renders other information contained in the Proxy materially misleading.  As a consequence, shareholders have not been provided material information, which has rendered materially misleading other statements in the Proxy.  Shareholders therefore have not been provided material information with which they need in order to ascertain whether or not to vote their shares for the Proposed Transaction.

7.      Despite the fact that recent accounts (including, among others, those of ProAssurance and Eastern themselves) confirm that Eastern is a well-capitalized, financially and operationally solid company with a firm foundation and positive future prospects, Defendants nevertheless agreed to this hasty "sweetheart" deal to sell the Company at grossly inadequate consideration, and described herein, without a meaningful bidding process.

8.      The conflicts of interest described above resulted in the failure of the Board to conduct arms-length negotiations with ProAssurance in connection with the acquisition of the Company.  The result was the Proposed Transaction, a rushed deal to sell the Company to

ProAssurance for a grossly inadequate price, without fully considering other potential alternatives or conducting any sort of a market check or equivalent effort to ascertain the true value of the Company or whether or not a higher value could be obtained in connection with a potential transaction.

9.      The Board agreed to unreasonable lock-up devices designed to prevent other bidders from making successful competing offers for the Company.  Specifically, the Merger Agreement contains a strict no-shop clause that prohibits Eastern from soliciting other potential bidders or from continuing ongoing discussions with potential acquirers and a provision that provides that Eastern forward any competing proposal from third parties, and a severe 4% termination fee plus $1 million expenses in the event that the Company fails to consummate the Proposed Transaction.

10.     Plaintiff seeks to enjoin or to rescind the Proposed Transaction in the event of its consummation if all material information regarding the Proposed Transaction is not provided to Eastern's public shareholders prior to the vote on the merger.

<u>**JURISDICTION**</u>

11.     This Court has jurisdiction over all claims asserted herein pursuant to § 27 of the 1934 Act for violations of §§ 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

12.     Venue is proper in this district because Eastern has its principal place of business in this district.  Plaintiff's claims arose in this district, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.  Moreover, each of the Individual Defendants, defined below, as Company officers and/or directors, has extensive contacts with this district.

## PARTIES

13.     Plaintiff Rudy Rosenberg has been, at all times relevant to the action, and continues to be, an owner of Eastern common stock.

14.     Defendant Eastern is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania.  Eastern, through its subsidiaries, provides workers' compensation insurance and reinsurance products in the United States.  Its Workers' Compensation Insurance segment offers workers' compensation products, including guaranteed cost policies, policyholder dividend policies, retrospectively-rated policies, deductible policies, and alternative market products to employers.  This segment provides its products and services through a network of independent insurance agents.  The Company's Segregated Portfolio Cell Reinsurance segment offers alternative market workers' compensation solutions comprising program design, fronting, claims administration, risk management, segregated portfolio cell rental, asset management, and segregated portfolio management services to individual companies, groups, and associations. This segment provides its products through independent agents.  The Board of Eastern has agreed to merge the Company with ProAssurance. ProAssurance has its headquarters in Madrid, Spain and is one of the ten (10) leading banks in the world measured by market capitalization and number one in the euro zone.  It is primarily a retail bank serving more than 80 million customers worldwide.  ProAssurance engages primarily in commercial banking with complementary activities in global wholesale banking, credit cards, asset management and insurance.

15.     Defendant Boguski is the Company's President, CEO, and a Director.  Boguski has been with the Company since the inception of its workers' compensation insurance operation in 1997.  He has served on the board of the pre-IPO form of the Company and its subsidiaries since 2001, and after the Company became a public company, was elected to the Company's

Board in November of 2010, and has served as the Chairman of the Board at Eastern Re Ltd., SPC[1] since March of 2011.  Boguski was promoted to the President and CEO position on January 1, 2011.  As a result of the Proposed Transaction, Boguski will receive $5,600,179 consisting of cash paid for options and restricted shares.  Boguski will also receive $300,000 payable each year on the first four anniversaries of the effective date of the Proposed Transaction.

16.     Defendant Robert Morris McAlaine ("McAlaine") is the Chairman of the Company's Board and has been in that position since the Company's initial public offering ("IPO") in June 2006.  McAlaine also serves as Chair of the Executive Committee and the Acquisition Committee.  As a result of the Proposed Transaction, McAlaine will receive $3,088,334 consisting of cash paid for options and restricted shares.

17.     Defendant Paul Robert Burke ("Burke") is a Director of the Company and has been since the Company's IPO in June 2006.  Burke was on the Board of Eastern in 2002, before the IPO, when Burke's firm, Northaven Management, Inc. ("Northaven"), made a substantial investment in the Company.  Defendant Burke is the Chair of the Audit Committee and has been since 2006 and also serves as a member of the Finance/Investment Committee, the Nominating/Governance Committee, and Acquisition Committee.  As a result of the Proposed Transaction, Burke, together with Northaven, will receive $16,721,722 consisting of cash paid for options and restricted shares.

18.     Defendant Ronald Lee King ("King") is a Director of the Company and has been since the Company's IPO in June 2006, and was a member of the Board of Eastern Life and

---

[1] Eastern Re Ltd., SPC is an operating subsidiary of the Company and is a specialty reinsurance company organized in 1987 as a Cayman-domiciled program underwriter and licensed as the first segregated portfolio company in Grand Cayman.

Health Insurance Company (formerly Educators Mutual), a subsidiary of the Company, from 2000 until Eastern Life and Health was acquired by Security Life Insurance Company of America in June 2010.  King serves on the Board's Nominating/Governance Committee and Audit Committee and is the Chair of the Compensation/Human Resources Committee.  As a result of the Proposed Transaction, King will receive $1,009,750 consisting of cash paid for options and restricted shares.

19.     Defendant Scott Carter Penwell ("Penwell") is a Director of the Company and Corporate Secretary and has been since the Company's IPO in June 2006.  Defendant Penwell was a founding member of the Company and served as a member of that Board since its inception in 1987.  Penwell also serves on the Board's Finance/Investment Committee and Acquisition Committee.   As a result of the Proposed Transaction, Penwell will receive $1,634,230 consisting of cash paid for options and restricted shares.

20.     Defendant William Lloyd Snyder III ("Snyder") is a Director of the Company and has been since the Company's IPO in June 2006.  Defendant Snyder also served on the Board of Eastern Life and Health from 2002 until the sale of that company in June 2010.  Snyder is the Chair of the Finance/Investment Committee.  As a result of the Proposed Transaction, Snyder will receive $2,798,250 consisting of cash paid for options and restricted shares.

21.     Defendant Charles Hall Vetterlein Jr. ("Vetterlein") is a Director of the Company and has been since the Company's IPO in June 2006.  Defendant Vetterlein was on the Board of Eastern Life and Health from 2002 until the sale of that company in June 2010.  Vetterlein serves on the Compensation/Human Resources Committee and Nominating/Governance Committee. As a result of the Proposed Transaction, Vetterlein will receive $833,250 consisting of cash paid for options and restricted shares.

22.     The defendants, named above in paragraphs 15 through 21, are referred to herein as Individual Defendants.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of all stockholders of the Company (except Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants) and their successors in interest, who are or will be threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

24.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable. There are approximately 7,910,827 shares of Eastern common stock outstanding owned by hundreds, if not thousands, of holders other than Defendants.

(b)     There are questions of law and fact which are common to the Class including and which predominate over any questions affecting only individual members, including:  (i) whether the Individual Defendants agreed to sell Eastern to ProAssurance at a grossly inadequate price; (ii) whether Defendants failed to make a meaningful effort to ascertain the true and accurate transactional value of the Company; (iii) whether the Proposed Transaction suffers from substantial conflicts of interest in that provides substantial benefits to insiders at the detriment of Eastern stockholders; (iv) whether the Proxy contains false and misleading statements and omissions; (v) whether the Defendants have violated §§ 14(a) and 20(a) of the Securities and Exchange Act and any other applicable laws, rules or regulations by disseminating a false and misleading Proxy; and (vi) whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by Defendants.

(c)     Plaintiff is committed to prosecuting this action and has retained counsel competent and experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of other members of the class, and Plaintiff has the same interests as the other members of the Class.  Plaintiff will fairly and adequately represent the Class.

(d)     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

(e)     Defendants have acted in a manner which affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

(f)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other Class members or substantially impair or impede their ability to protect their interests.

## **SUBSTANTIVE ALLEGATIONS**

**The Individual Defendants Agree To Sell Eastern**
**To ProAssurance At A Grossly Inadequate Price**

25.     Ever since becoming a public company in 2006, Eastern has been trying to position the Company for a sale.  Recently, Company stock has been on a dramatic rise:



26.     In an interview with seekingalpha.com, analyst Matthew Miller from Chanticleer Holdings commented that Eastern, from a loss ratio perspective, "is consistently among the top two or three most profitable companies." In regards to future prospects, Miller continued, "We suspect that tangible book value could be in the mid to upper $20's in three to five years. A multiple of 1.2 to 1.4 times gives you a range of $30 to $42 in that period of time, which I think is an interesting return possibility…."

27.     On September 23, 2013, ProAssurance and Eastern agreed to the Proposed Transaction, pursuant to which each Eastern shareholder will receive $24.50 in exchange for every share of Eastern common stock owned.

28.     The Proposed Transaction consideration is grossly inadequate and fails to sufficiently compensate Plaintiff and the Class for the actual value of their investments, as the Merger Consideration represents a mere 15.7% premium over the Company closing price of $21.16 on September 23, 2013, one day before the announcement of the Proposed Transaction.

29.     Nevertheless, the Individual Defendants hastily and unanimously voted to allow ProAssurance to acquire the remaining shares of Eastern stock for a shockingly low price. Defendants did so without adequate consideration of other alternatives or any attempt to maximize shareholder value or conduct a "market check" in connection with the sale of the Company to ascertain the true value of the Company and its common shares.

30.     W. Stancil Starnes ("Starnes"), ProAssurance's Chairman and CEO, acknowledged in the press release announcing the Proposed Transaction, that its acquisition of Eastern is in every way beneficial to its own business, allowing ProAssurance to diversify and "broaden its medically focused product lines."

31.     Eastern and the Individual Defendants agreed to this deal with ProAssurance despite a host of other overwhelming indicators and admissions that the Proposed Transaction consideration drastically undervalues Eastern, and that the Company was (and is) on solid financial footing.

32.     For example, on August 1, 2013, the Company filed a Form 10-Q with the SEC and issued a press release announcing the stellar performance of the Company:

- Revenue for the second quarter of 2013 increased to $47.1 million compared to $38.8 million for the same period in 2012.  Net premiums earned were $45.5 million for the second quarter of 2013 compared to $38.7 million for the same period in 2012.

- Net investment income was $1.1 million ($768,000 after-tax) for the three months ended June 30, 2013, compared to $1.1 million ($730,000 after-tax) for the same period in 2012.

- The change in equity interest in limited partnerships was income of $315,000 ($220,000 after-tax) for the three months ended June 30, 2013, compared to income of $118,000 ($82,000 after-tax) for the same period in 2012, an increase of $197,000.

Net realized investment losses, excluding the segregated portfolio cell reinsurance segment, were $66,000 ($43,000 after-tax) for the three months ended June 30, 2013 compared to net realized investment losses, excluding the segregated portfolio cell

11

reinsurance segment, of $1.2 million ($787,000 after-tax) for the same period in 2012, which included convertible bond investment portfolio after-tax net realized investment losses of $448,000 and $525,000 for the three months ended June 30, 2013 and 2012, respectively.  The Company accounts for changes in the estimated fair value of its convertible bond portfolio as a realized gain or loss.

33.     The Company's workers' compensation insurance segment reported net income of $3.5 million for the second quarter of 2013, compared to $2.2 million for the second quarter of 2012.  Highlights for the second quarter include:

- Direct written premiums increased to $46.2 million for the three months ended June 30, 2013, compared to $39.5 million for the same period in 2012, an increase of 17.0 percent.  Direct written premium includes premium ceded to the segregated portfolio cell reinsurance segment of $9.0 million and $8.1 million for the three months ended June 30, 2013 and 2012, respectively.

- Audit premium, which results from an examination of the policyholders' payroll and other records, resulted in the recording of additional premium to the Company which increased net premiums earned by $1.4 million for the three months ended June 30, 2013 compared to $864,000 for the same period in 2012.

- The combined ratio was 89.4 percent for the second quarter of 2013, compared to 91.6 percent for the same period last year.

- The calendar period loss and LAE ratio was 66.2 percent for the three months ended June 30, 2013 compared to 67.1 percent for the same period in 2012.  The calendar period loss and LAE ratio was impacted by additional audit premium to the Company of $1.4 million for the three months ended June 30, 2013, which decreased the 2013 loss and LAE ratio by 2.6 points compared to additional audit premium to the Company of $864,000 for the same period in 2012, which decreased the 2012 loss and LAE ratio by 2.5 points.  There was no loss reserve development recorded on prior accident years in the workers' compensation insurance segment for the three months ended June 30, 2013 and 2012.

- The expense ratio was 22.6 percent for the three months ended June 30, 2013, compared to 24.4 percent for the same period in 2012.  The decrease in the expense ratio is primarily attributable to growth in net earned premium, prudent expense management strategies, and an increase in Alternative Markets fee-based revenue, which is recorded as a reduction to underwriting expenses.

34.     Boguski was touting its performance and promising future prospects in the press release announcing results for the second quarter of 2013:

I am pleased to report another quarter of solid results in our workers' compensation insurance business during 2013, including operating earnings of $0.40 per diluted share for the three months ended June 30, 2013….***The favorable results were driven by solid growth in workers' compensation insurance direct written premiums, renewal rate increases, favorable premium renewal retention rates and a reduction in our consolidated expense ratio.***

I am pleased to report the addition of a new Alternative Market program in the second quarter of 2013, which brings our year-to-date new program total to three.

Our diluted book value per share was $17.29 as of June 30, 2013 compared to $17.17 per share as of March 31, 2013. The increase in diluted book value per share during the quarter was primarily due to favorable workers' compensation insurance operating results partially offset by a decrease in after-tax accumulated other comprehensive income related to our investment portfolio and a cash shareholder dividend of $0.11 per share paid in the second quarter of 2013.

I continue to be pleased with the progress on our 2013 strategic plan, including continued focus on organic growth and geographic expansion initiatives. Our Gulf South regional office is off to a solid start with year-to-date 2013 direct written premium of $2.9 million at favorable loss ratios.

35.     In sum, Eastern did not appear to be in trouble (much less severe distress) so as to justify the "sweetheart" deal the Individual Defendants cut with ProAssurance here.

**Defendants Have Embarked On An Illusory Process**

36.     Defendants failed to make a meaningful effort to ascertain the true and accurate transactional value of the Company. Instead, Defendants, by only hastily, at best, conducting an ineffective and illusory evaluation, rather than any sort of thorough evaluation of a market check or similar such mechanism.

37.     According to the Proxy, the Proposed Transaction began as an informal meeting on July 13, 2012 between executives of the Company and ProAssurance at a "Philadelphia airport." The parties discussed, in addition to other topics, their respective businesses and during

the course of their conversation, they expressed mutual interest in further discussions.  It is unclear whether the Board authorized this initial meeting of the two companies.

38.     Exclusive discussions with ProAssurance ensued, and sometime between October and December of 2012, the Company furnished information relating to Eastern and its business to ProAssurance, without any negotiations or executions of a confidentiality agreement, and giving ProAssurance the informational advantage over other possible bidders.

39.     Over the ensuing months, discussions led to ProAssurance's first offer of $23.50 and a request of a 5% termination fee on June 12, 2013.  This offer included future employment deals for the executives.  The Board rejected this offer and on July 1, 2013, ProAssurance increased its offer to the current Merger Consideration and reduced the termination fee to 4%.

40.     The Board decided that this offer was acceptable before even retaining a financial advisor to examine the fairness of the consideration.[2]

41.     Although Boguski and other executives were likely to secure lucrative employment with the combined company the Board did not form a special committee and allowed Boguski to spearhead the negotiations.

42.     On July 12, 2013, Eastern and ProAsurance executed a letter of intent ("LOI") setting forth the terms of the Proposed Transaction along with various provisions restricting the Company from soliciting other bidders.  Curiously, the Board agreed to limit its time to solicit proposals from potential bidders to a mere three weeks, when ProAssurance enjoyed a period of twelve months of exclusive negotiations.

43.     During the three weeks between the execution of the LOI and its expiration on August 1, 2013, the Company unsurprisingly only received two offers, both below the price

---

[2] A financial advisor, Keefe, Bruyette & Woods, Inc. ("KBW") was eventually retained on July 12, 2013, but not before the Board unilaterally determined, without basis, that the offer of $24.50 was acceptable.

ProAssurance has offered.  However, the Board did not give either bidder a chance to increase their bids and decided to move forward to exclusively work with ProAssurance in finalizing the deal.

44.     On September 23, 2013, the Board voted to approve the Proposed Transaction and entered into the Merger Agreement.

45.     As part of the Merger Agreement, the Individual Defendants agreed to typical onerous and preclusive deal terms, including an excessive 4% termination fee and up to $1 million expense fee, and a strict no-solicitation provision.

46.     Specifically, Section 6.8 of the Merger Agreement bars the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by ProAssurance.

47.     The Merger Agreement also contains a matching rights provision, whereby Eastern must promptly notify ProAssurance should it receive an unsolicited competing acquisition proposal.  Pursuant to Section 6.8(a) of the Merger Agreement, Eastern must notify ProAssurance of the bidder's identity, the details of the negotiations, and the terms of the bidder's offer.

### *The Proposed Transaction Suffers From Substantial Conflicts of Interest*

48.     The Proposed Transaction provides substantial benefits to insiders at the detriment of Eastern stockholders.  The Company's September 24, 2013 press release first reported Eastern executive's continuing employment deals, and Starnes stated, "We are highly focused on acquiring companies with strong management and superior insurance expertise and have found that in the Eastern team…  We are very pleased that Eastern's senior executives have agreed to enter into long-term employment contracts in conjunction with the transaction."  The

Proxy then disclosed that, upon completion of the Proposed Transaction, Eastern insiders have secured lucrative post-closing retention agreement and the details thereof.

49.     The Proposed Transaction is set to provide very rich personal benefits to Boguski and other Eastern management and insiders under retention employment agreements negotiated with ProAssurance, allowing them to continue on in lucrative employment positions at the newly-formed company.

50.     At the consummation of the Proposed Transaction, defendant Boguski is also expected to receive $5,600,179 as a result of accelerated vesting of restricted stock and deferred exchange payments.

### *The Proxy Contains False and Misleading Statements and Omissions*

51.     On October 11, 2013, Eastern filed the Proxy SEC, which announces that there will be a special meeting of Eastern shareholders, at which they will be asked to vote in favor of the Proposed Transaction.  The Proxy fails to provide the Company's shareholders with all necessary and material information such that they can make an accurately or adequately informed decision regarding the Proposed Transaction.

52.     As set forth below, the Proxy omits material information about the Proposed Transaction that must be disclosed to Eastern shareholders in order for them to make a fully informed decision as to whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to them.

53.     The Proxy fails to disclose material information concerning certain underlying methodologies and multiples relied upon and observed by KBW, the Company's financial advisors, so that shareholders can properly assess the credibility of the various analyses

performed by KBW and relied upon by the Board in approving and recommending the Proposed Transaction.

54.      KBW conducted five valuation analyses of the Company: (i) a Select Publicly Traded Companies Analysis, (ii) a Selected Precedent M&A Transactions Analysis, (iii) a Discounted Cash Flow Analysis, (iv) a Historical Stock Price Analysis, and (v) a Historical Premiums Paid Analysis.   These analyses derived overly broad and therefore questionable exchange ratio ranges for Eastern company stock and do not support the low value for Eastern shares.   While claimed to be based on projections provided by Company management (the "Projections"), these Projections were not disclosed in the Proxy.

55.      The Proxy fails to disclose certain key data and inputs underlying the financial analysis supporting the fairness opinion of KBW, including:

a.      the assumptions used to prepare Eastern's projections, which were entirely undisclosed in the Proxy;

b.      the definition of the terms "operating net earnings," "operating earnings," and "operating net income";

c.      the operating earnings (and/or operating net earnings and operating earnings) in the aggregate and on a per-share basis;

d.      earnings per share, if different than the operating earnings;

e.      Generally Accepted Accounting Principles ("GAAP") book value per share;

f.      GAAP tangible book value per share;

g.      Basic shares outstanding;

h.      Fully diluted shares outstanding;

i.      Cost savings expected from merging the Indiana subsidiary and Pennsylvania subsidiary of Eastern;

j.      Synergies expected from the combination of Eastern and ProAssurance.

56.     With respect to the *Select Publicly Traded Companies Analysis* conducted by KBW, the Proxy fails to disclose: (i) the identity and multiples for each company considered in this analysis but excluded from the Proxy; and (ii) company-by-company multiples.

57.     With respect to the *Selected Precedent M&A Transactions Analysis* conducted by KBW, the Proxy fails to disclose: (i) data for each transaction considered in this analysis yet excluded from the Proxy; (ii) the date for each selected transaction; (iii) the transaction value for each selected transaction; (iv) the pricing multiples for each selected transaction; and (v) the premium for each selected transaction.

58.     With respect to the *Discounted Cash Flow Analysis*, the Proxy is materially misleading regarding whether projected earning estimates or dividend stream were used by KBW.  The Proxy fails to clarify and disclose if the projected dividends were based on an assumption made by KBW, and if so, the Proxy fails to disclose the assumption and the basis for such an assumption.  The Proxy also fails to identify, quantify, and provide a source of KBW's capital asset pricing model assumptions.

59.     With respect to the *Historical Premiums Paid Analysis*, the Proxy further fails to provide the information resulting from both the $29.25 price and the $30.25 price in footnote 2 on page 39.  It is inappropriate to examine the earlier offer rather than the price actually offered.

60.     With respect to the *Background of the Merger*, the Proxy also fails to provide shareholders with material information regarding the events leading up to the announcement of the Proposed Transaction.  For example, the Proxy does not disclose the reason why the Board had a "strong preference for an all cash transaction," instead of having a preference in maximizing shareholder value with whatever form of consideration; the process surrounding the Board's engagement of KBW, including whether KBW was approached by the Company, or

whether KBW unilaterally provided the April 3, 2013 presentation to the Board, and whether the Board or the Company considered any other financial advisor.  The Proxy does not disclose the reason the Board approved the LOI by ProAssurance even before the retention of KBW and how it arrived at that decision.

61.     The Proxy also does not disclose the circumstances surrounding the negotiations of various deal terms that favor the Company's insiders or the deal protection provisions, including the exorbitant and unreasonable termination fee and the other provisions described herein.  The Proxy is devoid of any explanation for the retention and other employment decisions agreed upon between the Board, the executive officers of the Company, and ProAssurance.  As discussed herein, the inclusion of the deal protection devices in the Merger Agreement is questionable, given Eastern's single-bidder strategy.  The Proxy did not include the chronology of the negotiations of the terms of the retention and severance agreements.  Without the disclosure of this information, however, Eastern's public shareholders cannot determine whether the Proposed Transaction was truly the product of the Board's pursuit of a transaction that might maximize value (as the Proxy attempts to portray), or, rather, that the Proposed Transaction resulted from the motivation of the Board and other Eastern insiders to place their interests ahead of those of the Company's unaffiliated shareholders.

62.     Nor does the Proxy disclose the rationale behind agreeing to a short time frame of 3 weeks for identifying other bidders, when ProAssurance had 12 months of exclusive negotiations with the Company.  The Proxy completely omitted any details surrounding the first offer of $23.50 by ProAssurance, the negotiations leading up to this offer, and the exact dates of those conversations.  The Proxy omitted the same details surrounding ProAssurance's final offer of $24.50.  The Proxy also omitted details surrounding the bids by Company A and Company B,

including the Company's response to each bidder, and whether each was allowed to increase their bids.  The Proxy also omitted information regarding the reasons the other potential bidders declined to submit offers.

63.     Lastly, the Proxy fails to disclose the details and rationale surrounding the merger of the Indiana and Pennsylvania subsidiaries, and why the merger did not occur sooner, since it was expected to result in cost savings, an objective the Board clearly aimed to achieve ever since the Company went public, and details surrounding what, if any, the actual cost savings were, and whether such cost savings were included and reflected in the undisclosed management projections used by KBW.

64.     The Proxy also fails to disclose whether other potential acquirers have contacted the Company following execution of the Merger Agreement and, if so, the results of any such contacts or any negotiations with any such alternative potential acquirers.

## COUNT I

### VIOLATION OF SECTION 14(a) OF THE 1934 ACT AND
### RULE 14A-9 PROMULGATED THEREUNDER

65.     Plaintiff repeats all previous allegations as if set forth in full herein.

66.     The Individual Defendants have caused Eastern to prepare and file the Proxy with the SEC with the intention of soliciting shareholder support of the Proposed Transaction.

67.     Defendants disseminated the false and misleading Proxy specified above, which failed to disclose the material facts and information necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     The Proxy was prepared, reviewed and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Transaction, and

the actual intrinsic value of the Company's assets as a stand-alone entity and as a merger partner for ProAssurance.

69.     In so doing, Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, Defendants were aware of this information and were aware of their duty to disclose this information in the Proxy.

70.     Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.  The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy.

71.     By reason of the foregoing, Defendants have violated § 14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

72.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

## AGAINST INDIVIDUAL DEFENDANTS FOR VIOLATION OF § 20(a) OF THE 1934 ACT

73.     Plaintiff repeats all previous allegations as if set forth in full herein.

74.     The Individual Defendants acted as controlling persons of Eastern within the meaning of § 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Eastern, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy filed

with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.

75.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the Proposed Transaction giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of this document.

77.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Proposed Transaction.   The Proxy purports to describe the various issues and information that they reviewed and considered and which had input from the Board.

78.     Moreover, the Individual Defendants each have the duty individually to discover and correct any material misstatement or omission of material fact, which they have failed to do. By virtue of the foregoing, the Individual Defendants have violated § 20(a) of the 1934 Act.

79.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons,

these defendants are liable pursuant to § 20(a) of the 1934 Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs will be irreparably harmed.

**WHEREFORE,** Plaintiff demands judgment against Defendants jointly and severally, as follows:

(a)     declaring this action to be a proper class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure and certifying the Class as defined herein;

(b)     enjoining, preliminarily and permanently, the Proposed Transaction;

(c)     enjoining Defendants, their agents, counsel, employees and all person acting in concert with them from consummating the Proposed Transaction unless and until the Company adopts and implements a fair sales process that includes amending the Proxy so that it no longer omits material information concerning, among other things, the Proposed Transaction;

(d)     in the event that the Proposed Transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(e)     directing that Defendants account to Plaintiff and the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their violation of the federal securities laws;

(f)     awarding Plaintiff and the Class the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's and the Class's attorneys and experts; and

(g)     granting Plaintiff and the Class such further relief as the Court deems just and proper.

### <u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

October 31, 2013

**BONI & ZACK LLC**

Michael J. Boni (PA 52983)
Joshua D. Snyder (PA 88657)
John E. Sindoni (PA 91729)
15 St. Asaphs Road
Bala Cynwyd, PA  19004
Telephone: (610) 822-0200
Fax:  (610) 822-0206
Email: mboni@bonizack.com
          jsnyder@bonizack.com
          jsindoni@bonizack.com

*Counsel for Plaintiff and the Proposed Class*


**MILBERG LLP**
Kent A. Bronson
Gloria Kui Melwani
One Pennsylvania Plaza
New York, New York  10119
(212) 594-5300

*Of Counsel*